UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
SEAN G. FELDER,

          Plaintiff,

     -against-

MADISON SQUARE GARDEN, *et al.*,

          Defendants.
-------------------------------------------------------------------------X

:    15cv4038 (GBD) (DF)

:    **REPORT AND**
:    **RECOMMENDATION**

:

:

:

**TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:**

    In this employment discrimination case, which has been referred to this Court for general

pretrial supervision and to report and recommend on dispositive motions (Dkt. 19), *pro se*

plaintiff Sean G. Felder ("Plaintiff") claims that defendants named herein as Madison Square

Garden and Radio City Music Hall[1] (collectively, "Defendants") terminated his employment and

retaliated against him, in violation of his rights under Title VII of the Civil Rights Act of 1964,

---

[1] According to Defendants' Rule 7.1 Corporate Disclosure Statement (Dkt. 25), the correct name of the entity identified by Plaintiff as "Madison Square Garden" is "MSG Sports & Entertainment, LLC" (referred to herein as "MSG"), and the correct name of the entity identified by Plaintiff as "Radio City Music Hall" is "Radio City Productions LLC" (referred to herein as "Radio City"); Defendants further state that the ultimate parent of both of these entities is The Madison Square Garden Company. This Court notes that, in the caption of Plaintiff's current, operative pleading (his Second Amended Complaint for Employment Discrimination, dated Dec. 1, 2015 ("2d Am. Compl.") (Dkt. 14)), Plaintiff names MSG as the defendant, but, in the body of his form pleading, he identifies Radio City as the defendant (*see id.* § I(B)). This represents a change from Plaintiff's prior pleadings (*see* Complaint for Employment Discrimination, dated May 14, 2014 ("Compl") (Dkt. 2); Amended Complaint for Employment Discrimination, dated July 24, 2015 ("Am. Compl.") (Dkt. 7)), wherein Plaintiff named MSG as the defendant in both the caption and body of the pleadings, and referred to Radio City only as the address where Plaintiff was employed (*see* Compl. § I (C); Am. Compl. § I(C)). Liberally construing Plaintiff's current pleading (*see* Discussion, *infra*, at Section I(A)), this Court will assume that he has now intended to sue both MSG and Radio City.

42 U.S.C. §§ 2000e to 2000e-17 ("Title VII") (*see* 2d Am. Compl. § II(A)).  Plaintiff also claims

that Defendants engaged in "unfair labor practices."  (*Id.*)

      Currently before the Court is a motion by Defendants to dismiss Plaintiff's Second

Amended Complaint.  (Dkt. 26.)  For the reasons discussed below, I recommend that

Defendants' motion be granted, with limited leave to amend.

**BACKGROUND**

      A.     **Plaintiff's Factual Allegations**

      In his Second Amended Complaint, as supplemented by his opposition to Defendants'

motion to dismiss (*see* Letter to the Court from Plaintiff, dated Oct. 1, 2016 ("Pl. Opp.")

(Dkt. 36)),[2] Plaintiff alleges that he was employed by Defendants from October 29, 2002 to

May 12, 2014 (*id.*, at 1).  Although, in these submissions, Plaintiff does not identify the position

he held, he was apparently employed as a security guard.[3]  Plaintiff asserts that, during the

course of his employment, he "experienced a number of discriminatory tactics that precluded

[him] from doing [his] job efficiently and growing as an employee."  (*Id.*)  Plaintiff, however,

provides only limited details regarding these supposed "discriminatory tactics."

      In his pleading, he first summarizes the facts underlying his claims in this way:

> Lisa Mendez, Clinton Neals gave preferential treatments to
> Hispanic employees, giving them upper management positions.

---

[2] *See* Discussion, *infra*, at Section I(A), regarding the propriety, on a motion to dismiss, of the Court's consideration of allegations asserted in a *pro se* plaintiff's opposition papers.

[3] In the complaint that Plaintiff filed with the New York City Commission on Human Rights ("NYC CHR") before commencing this action, Plaintiff stated that he was employed by The Madison Square Garden Company and/or Radio City as a "Security Guard."  (*See* Declaration of Joseph A. Nuccio, Esq., dated Aug. 1, 2016 ("Nuccio Decl.") (Dkt. 28), Ex. A (Verified Complaint, dated Dec. 29, 2014 ("NYC CHR Compl.")) ¶ 5.)  Consistent with this, Defendants state in their moving papers that Plaintiff was employed as a part-time Security Officer.  (*See* Memorandum of Law in Support of Defendants' Motion To Dismiss, dated Aug. 1, 2016 ("Def. Mem.") (Dkt. 27), at 2.)

> Mr. Neals (then Dir. of Security) verbally abused me back in 2008,
> I reported his ungrateful antics to GM Rich Claffey, HR Ann
> Jackson.  After meeting, I was denied upper management position.
> Mr. Neals did unfair labor practices by forcing employees [to] get
> NYC Fireguard License, but we didn't get fireguard pay.  Hiring
> outside Sterling Security, pay them more than in[-]house security!

(2d Am. Compl. § II(E).)  He then attempts to flesh out this summary by alleging certain

additional facts, both in an attachment to his pleading entitled "FACTS" (Dkt. 14, at 7-10) and in

his opposition to Defendants' motion.

　　　　While his additional allegations are somewhat difficult to follow, Plaintiff appears to

assert, *inter alia*, that, on "numerous" occasions, in retaliation for having spoken out about

purportedly "tyrannical behavior exhibited by the 'leadership' in the security division at [MSG],"

he was either "written up" or otherwise disciplined by supervisors for conduct in which he had

not engaged or that, in his view, was not worthy of reprimand.  (Pl. Opp., at 1.)  These

"erroneous write-ups," as he characterizes them, allegedly commenced after October 7, 2008,

when Plaintiff wrote a letter to General Manager Richard Claffey ("Claffey"),[4] complaining that

the Director of Security, Clinton Neals ("Neals"), had been "verbally abusive," particularly "to

employees of color, especially those of African American [d]escent" (Pl. Opp., at 1; *see also*

Dkt. 14, at 7 (stating that Neals "verbally abused [Plaintiff] . . . til[] October 2008, knowing that

[Plaintiff] spoke to [Claffey] about lack of respect in [the] security department").)[5]  Plaintiff

generally alleges that this letter "made [him] 'Persona Non Grata' with . . . Neals and the rest of

---

[4] In his Second Amended Complaint, Plaintiff variously spells this individual's name as
"Claffey" and "Cleffy," while, in his opposition submission, he spells it as "Claffy."  From
public sources, this Court understands that the correct spelling is "Claffey."

[5] Nowhere in his Second Amended Complaint or supplemental submissions does Plaintiff
actually state that he, himself, is African American, although, in his administrative complaint, he
stated that he is Black.  (*See* NYC CHR Compl. ¶ 1.)

the management at MSG."  (Pl. Opp., at 1; *see also id.* (stating that, after writing the letter, Plaintiff's "conditions at work worsened").)

As to the specific instances of retaliatory conduct that he alleges, Plaintiff first states that, "on October 24, 2008 . . ., when cleaning out [his] locker at work, [he] greeted a fellow co-worker and . . . Neals deemed it a reason to send [Plaintiff] home and lose a day's pay."  (*Id.*)  Second, Plaintiff alleges that, on December 16, 2008, Neals falsely accused him of letting a health inspector into the building and directed a supervisor, Wayne Little ("Little") to "write [Plaintiff] up" for this.  (Dkt. 14, at 7.)  Plaintiff states that he became "incensed," and that Neals then retaliated against him by telling another supervisor, Lisa Mendez ("Mendez"), not to give him certain responsibilities.  (*Id.* (alleging that Neals told Mendez "not to make [Plaintiff] lead response again as turn of retaliation" [sic]).)  Third, Plaintiff asserts that, on September 26, 2013, he was written up by Little for being late to work, even though Plaintiff had called in, to state that he would be late.  (*Id.*)  Fourth, Plaintiff alleges that, on November 28, 2013, after getting into an argument with his supervisor, Mike Simpkins ("Simpkins")[6] and reporting Simpkins to Human Resources, Mendez and Little wrote Plaintiff up for reporting a supervisor – even though, by then, Plaintiff and Simpkins had "made up."  (*Id.*, at 8.)  Plaintiff contends that this "write up" was "retaliation showing that [Mendez and Little] wanted to humiliate [him]."  (*Id.*)

Plaintiff also generally alleges that Neals "on occasion would give preferential treatment to certain Hispanic employees" (Pl. Opp., at 1), and that Mendez also "played favoritism" by giving "upper management" positions to security guards with "less seniority" (Dkt. 14, at 8; *see*

---

[6] In the typed portion of his Second Amended Complaint, Plaintiff spells this supervisor's name twice as "Simpkins" and once as "Simplins" (*see id.*, at 8); this Court assumes that the latter is a typographical error.

*also id.*, at 9 (suggesting that, as the result of favoritism, Plaintiff was "overlooked for [an] upper management and superior position")).  As to Mendez, Plaintiff more specifically alleges that an individual named Derek Porter ("Porter"), who was hired in 2006 and trained by Plaintiff, was transferred to Beacon Theatre and appointed "event supervisor" there, which Plaintiff found "insulting."  (*Id.*, at 9.)[7]  Plaintiff states that "[a]ll [he] wanted was a transfer to Beacon Theatre or [for] MSG to clean sites," but "[m]eanwhile other employees with less seniority w[ere] allowed to transfer."  (*Id.*, at 10.)  Plaintiff suggests that he was not allowed to transfer because Radio City "did not like the fact that [he] was outspoken at times."  (*Id.*; *see also id.*, at 9 (alleging that Plaintiff and certain other employees were "blackmailed if [they] spoke out to [the] HR Department").)  Plaintiff additionally suggests that he was not given extra assignments, such as the opportunity to work events, or "to escort Rocket[te]s to special events" (which would have afforded him significant extra hours of work), because Radio City "wanted [him] stuck," rather than to "grow as an employee."  (*Id.*, at 9.)

With respect to Defendants' purportedly unfair labor practices, Plaintiff alleges that Neals and Little would contact an outside security company and hire its security personnel to work during special events, at the rate of $25 to $30 per hour, while in-house security guards only received $12 to $13 per hour (which Plaintiff characterizes as "slave labor") plus a mere $50 bonus for "all the work [they] do, moving barricades and dealing with hostile crowds all the time."  (*Id.*, at 8.)  Plaintiff also alleges that Neals and Mendez "demanded that [Radio City] security [personnel] obtain [New York] State fireguard license[s] to stay employed at the

---

[7] Although it is unclear if he offers this as another example of a less senior employee receiving preferential treatment over more senior employees, Plaintiff also alleges that an "overnight worker" named Perett Murray "rat[ted] out workers sleeping on post," and got those workers fired.  (Dkt. 14, at 9.)

company" (*id*.; *see also id*., at 9 (further alleging that, unless employees achieved a certain score on the test, they could not work at the site)), but that, when the guards then performed work "pertaining to fireguard," they were not given "fireguard pay" (*id*., at 9; *see also* Pl. Opp., at 1 (stating that Neals "made certain employees obtain external licenses, without properly being compensated for their new certification")).

Finally, Plaintiff makes allegations suggesting that, during the entire period from January 27, 2009, when he had a meeting with Claffey, senior management, and Ann Jackson (a Director of Human Resources at MSG) to "[air] all [of his] grievances" (Pl. Opp., at 1), to the date of the termination of his employment in May 2014, he was deliberately given fewer hours and was harassed. Although Plaintiff describes his initial belief that the January 2009 meeting had resolved his concerns (*see id.* (stating that he was then "under the impression that this was in the past and that we were all starting to work on a clean slate together")), he then alleges that his "[r]emaining years at [MSG] were awful," and he "felt that [he] was being punished for following all the procedure[s] that [the] company had laid out for its employees to safely give complaints . . ." (*id*.). He states that, after the January 2009 meeting, Mendez reduced his work hours from more than 40 hours per week to fewer than 10. (*Id*.) He also alleges that, "[b]efore 2009[,] [he] would clear 1000+ hours yearly and be entitled to sick and vacation pay under MSG company policy[,] but after the incident that never happened again." (*Id*. at 1-2.) Plaintiff further asserts that, "[a]fter the year 2012, [he] would call . . . Mendez for [his] weekly schedule, only to be told that there was no work at all for [him]." (*Id*. at 2.)

Plaintiff also seems to suggest that Mendez's actions – both in reducing his hours and eventually in firing him – were dictated by upper management and/or Human Resources, although he does not specify who directed Mendez to take these actions. In this regard, Plaintiff

6

merely alleges that Mendez "was sent to fire [him]," to "deduct [his] working hours," and to

"create a hostile environment at [the] work place." (Dkt. 14, at 9.) Plaintiff does allege that,

during the last year of his employment, MSG Human Resources Director Ernest Higgins

("Higgins") knew that Mendez "verbally abused" him and "deducted [his] hours" (*id*.), and he

also alleges that, when "Higgins failed to call [a] July, 2014 meeting at [Radio City]," Higgins

"was plotting a lot to terminate [him] and deny [him] unemployment benefits" (*id*., at 8).

Plaintiff additionally claims that, upon being "laid off," he received "[n]o type of profit sharing,"

and suffered financially. (*See id*., at 9 (stating that Plaintiff had to borrow money, and "could

have been homeless if [his] mother did not help").)

**B.    Administrative Proceedings**

With their motion to dismiss, Defendants have submitted a copy of a complaint of

discrimination that Plaintiff apparently filed with the NYC CHR, prior to commencing this

action. (*See* NYC CHR Compl. (attached as Ex. A to the Nuccio Decl., as noted *supra* at n.3).)

That administrative complaint, which named The Madison Square Garden Company, Radio City,

and Mendez as respondents, alleged that Defendants violated Title VII by discriminating against

Plaintiff based upon his race. (*Id*. ¶ 10.) The only substantive allegations contained in Plaintiff's

administrative complaint, though, were the following:

> 6.     From in or around February 2014 to approximately
>        May 12, 2014 (the 'Termination Date'), Complainant [who
>        is Black] was given no weekly work for many weeks, and
>        only 5-7 hours of work for other weeks, rather than the
>        usual schedule of 25-35 hours/week. Upon information
>        and belief, Mendez gave more work to Hispanic workers
>        during this period who had less seniority than Complainant.
>
> 7.     Despite his seniority, Complainant was terminated upon the
>        Termination Date without being given an explanation.

> 8.      Upon information and belief, at least one other Black
>         employee, Dennis Gilmore, was terminated at around the
>         same time as Complainant.

(*Id*. ¶¶ 1, 6-8.)  Plaintiff authorized the NYC CHR to accept his complaint on behalf of the

United States Equal Employment Opportunity Commission ("EEOC").  (*Id*. ¶ 10).

Defendants have also submitted to the Court the NYC CHR's April 7, 2015 Notice of

Administrative Closure of Plaintiff's case, which indicates that Plaintiff's administrative case

was closed, in the NYC CHR's discretion, after Plaintiff requested dismissal of his charges so

that he could pursue the matter in a judicial forum instead.  (Nuccio Decl., Ex. B

("Complainant . . . requests that the Complaint be dismissed for administrative convenience

because Complainant intends to pursue his claims in court.").)  The Notice indicates that, "under

these circumstances," the agency had determined that it was "not in the public interest" to pursue

Plaintiff's administrative complaint.  (*Id*.)  The EEOC's Dismissal and Notice of Rights, dated

May 12, 2015, which Plaintiff attached to his Second Amended Complaint (Dkt. 14, at 5),

similarly states that the EEOC had closed its file on Plaintiff's charge because Plaintiff "wishe[d]

to pursue [the] matter in Federal District Court."  (*Id*.)  The EEOC Notice also informed Plaintiff

of his right to sue within 90 days of receipt of that Notice.

## C.      **Proceedings in this Court**

### 1.      **Plaintiff's Earlier Pleadings, and the Court's Orders To Amend**

Plaintiff commenced this action on May 18, 2015, by filing a *pro se* Complaint,

principally claiming that he had been subjected to discriminatory termination, unequal terms and

conditions of employment, and retaliation.  (*See* Compl. (Dkt. 2) § II(A).)  As factual support for

his claims, Plaintiff alleged that Mendez had verbally abused him and decreased his hours; that

he "was overlooked for upper management positions"; that "Mendez hired Hispanics with less

seniority to upper management positions"; that he "told [Human Resources] Director Higgins to investigate [and] transfer [him]," but Higgins "did nothing"; that Radio City denied him unemployment benefits; and that his employers had been investigated for unfair labor practices. (*See id.* § II(E).)

Finding these allegations insufficient to state plausible claims of discrimination or retaliation, the Honorable Loretta A. Preska, Chief United States District Judge, issued an Order To Amend, dated July 17, 2015.  (Dkt. 5.)  In that Order, Judge Preska explained the pleading standards set out in Rule 8 of the Federal Rules of Civil Procedure, and directed Plaintiff to submit, within 60 days, "an amended complaint in which he indicates his race and provides facts from which an inference can be made that he was discriminated against because of his race and was retaliated against for participating in protected activity."  (*Id.*, at 3, 4.)

On August 4, 2015, Plaintiff filed an Amended Complaint.  (*See* Am. Compl. (Dkt. 7).) This time, claiming discriminatory termination and retaliation (*id.* § II(A)), Plaintiff named four other employees who were allegedly "mistreated" and "verbally abused" when working at Radio City (*id.* § II(E)).  He also alleged generally that employees in the security department were treated as "slave labor," in that they were "overworked and underpaid"; that "[s]ome security guards worked without [a] license," while others worked "fireguard" shifts, but were "not paid fireguard salar[ies]"; and that "favoritism" and "retaliation tactics w[ere] used if [the employees] spoke out."  (*Id.*)  Shortly before – and in the months immediately after – his filing of this Amended Complaint, Plaintiff also filed a series of letters to the Court (Dkts. 6, 8-12), attaching various materials and making a number of additional allegations.

Again finding his allegations (including those raised in his letters to the Court) to be insufficient to state a Title VII claim – or, liberally construing his submissions, a potential claim

under the Fair Labor Standards Act ("FLSA") – Chief Judge Preska issued a second Order to

Amend, on November 17, 2015.  (Dkt. 13.)  In that second Order, the Court noted that, to the

extent Plaintiff was attempting to assert claims on behalf of others, he could not do so without

representation by counsel, and the Court therefore dismissed any such claims with prejudice.

(*Id.*, at 3.)  Further, in addition to reiterating the Rule 8 pleading standards, the Court, this time,

not only laid out what Plaintiff would need to plead to state viable Title VII discrimination and

retaliation claims, but also what would be needed to state a viable FLSA claim.  (*Id.*, at 4-5.)

The Court gave Plaintiff another 60 days to file a second amended complaint consistent with the

requirements described in its Order.  (*Id.*, at 6.)

      Plaintiff filed his Second Amended Complaint on December 1, 2015.  (Dkt. 14.)

## 2.        Defendants' Motion To Dismiss

      On August 1, 2016, Defendants filed their motion to dismiss the Second Amended

Complaint.  (*See* Defendants' Notice of Motion To Dismiss, dated Aug. 1, 2016 (Dkt. 26); Def.

Mem. (Dkt. 27); Nuccio Decl. (Dkt. 28).)[8]  In their motion, Defendants argue (1) that any

Title VII claim that Plaintiff may be attempting to assert relating to his termination or any lack of

job advancement should be dismissed for failure to plead a *prima facie* case of discrimination

(Def. Mem., at 5-8); (2) that Plaintiff's Title VII retaliation claim should be dismissed as

unexhausted and time-barred, and also because Plaintiff has failed to plead a *prima facie* case of

Title VII retaliation (*see id.*, at 8-11); and (3) that, to the extent Plaintiff's pleading could be

liberally read to include a hostile-work-environment claim under Title VII, any such claim

---

[8] Defendants also duly notified Plaintiff, as required under Local Civil Rule 12.1 of this Court, of the potential for, and consequences of, the Court's conversion of their motion to a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  (*See* Dkt. 29 (Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings); *see also* Dkt. 30 (Certificate of Service); Local Civ. R. 12.1.)

should be dismissed for essentially the same reasons as Plaintiff's retaliation claim, *i.e.*, because the claim is unexhausted and time-barred, and because Plaintiff's pleading does not state a *prima facie* case of a hostile work environment (*see id.*, at 11-12).  Defendants also argue that Plaintiff has failed to state a claim for "unfair labor practices" (*see id.*, at 13-14), and that, after having already been afforded two opportunities to amend his pleading to state a viable federal claim, he should not be granted further leave to amend (*see id.*, at 14-16).

On October 4, 2016, Plaintiff filed his opposition to Defendants' motion (*see* Pl. Opp. (Dkt. 36)), and, on October 28, 2016, Defendants filed a reply (Reply Memorandum of Law in Support of Defendants' Motion To Dismiss, dated Oct. 28, 2016 (Dkt. 40)), essentially arguing that nothing in Plaintiff's opposition addressed the deficiencies that Defendants had identified in their moving papers (*see generally id.*).

## DISCUSSION

## I.    APPLICABLE LEGAL PRINCIPLES

### A.    Rule 12(b)(6)

A complaint may be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure where it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. (12)(b)(6).  In deciding a motion to dismiss, the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted); *accord Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997).  The issue is not whether the plaintiff will ultimately prevail, but whether his claim, as pleaded, is sufficient to afford him the opportunity to proceed on the evidence.  *See Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

Thus, the court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991) (internal quotation marks and citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney, & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).

Even plaintiffs who are proceeding *pro se* must comply with relevant procedural and substantive rules, and, accordingly, to survive a motion to dismiss, a *pro se* complaint must "'state[] a plausible claim for relief.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). It is, however, "well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (collecting cases); *see also Hughes v. Rowe*, 449 U.S. 5, 9-10 (1980) (noting that a *pro se* party's pleadings must be liberally construed in his or her favor and are held to a less stringent standard than the pleadings drafted by lawyers); *Harris*, 572 F.3d at 72 ("Even after *Twombly*, . . . we remain obligated to construe a *pro se* complaint liberally." (citations omitted)); *Lerman v. Bd. of Elections*, 232 F.3d

135, 139-40 (2d Cir. 2000) ("Since most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, [a court] must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency." (citations omitted)). This is especially true in the context of civil rights complaints. *See Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001); *see also Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (noting that a court must be "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations").

In general, on a motion to dismiss, a court must limit its consideration to: "(1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; and (4) documents upon whose terms and effect the complaint relies heavily, *i.e.*, documents that are 'integral' to the complaint." *See Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003) (citing *Brass v. American Film Techs.*, 987 F.2d 142, 150 (2d Cir. 1993); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). Nonetheless, despite these constraints, "the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum," to supplement the allegations in the complaint. *Burgess v. Goord*, No. 98cv2077 (SAS), 1999 WL 33458, at *1 n.1 (S.D.N.Y. Jan 26, 1999) (internal quotation marks and citations omitted); *see also, e.g.*, *Samuels v. Fischer*, 168 F. Supp. 3d 625, 645 n.11 (S.D.N.Y. 2016) (finding that, in resolving motion to dismiss, it was "appropriate to consider allegations contained in [p]laintiff's [o]pposition" (collecting cases)); *Goldson v. Kral, Clerkin, Redmond, Ryan, Perry & Van Etten, LLP*, No. 13cv2747 (GBD) (FM), 2014 WL 4061157, at *3 (S.D.N.Y. July 11, 2014) (amended report and recommendation) ("When a plaintiff is proceeding *pro se*, the Court also

may rely on any opposition papers in assessing the legal sufficiency of the plaintiff's claims" (citation omitted)), *adopted by* 2014 WL 3974584 (Aug. 13, 2014); *Sommersett v. City of New York,* No. 09cv5916 (LTS) (KNF), 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011) ("[W]here a *pro se* plaintiff has submitted other papers to the [c]ourt, such as legal memoranda, the [c]ourt may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations." (citation omitted)).

Although courts have not followed this approach in every case, *see, e.g.*, *Brunson v. Duffy*, No. 12cv9465 (KBF), 2015 U.S. Dist. LEXIS 29015, at *4 (S.D.N.Y. Mar. 6, 2015) (citing *pro se* cases where courts declined to consider new facts included in opposition), it is certainly true that the papers submitted by a *pro se* plaintiff in opposition to a Rule 12(b)(6) motion may offer clarification or context that can aid the Court in understanding the plaintiff's pleading and in affording it a liberal construction, *see id.,* at n.4 (noting that "a district court needs to assess each case on an individual basis").  Especially in the civil rights context, where courts should act with particular care before dismissing a plaintiff's complaint, taking the step of examining a *pro se* plaintiff's opposition papers to see if they shed light on his initial allegations is consistent with the mandate that *pro se* submissions be "interpreted to raise the strongest arguments that they suggest."  *Elliott v. Nestle Waters N. Am. Inc.*, No. 13cv6331 (RA), 2014 WL 1795297, at *7 (S.D.N.Y. May 6, 2014) (internal quotation marks and citation omitted).  Moreover, where the addition of allegations contained in opposition papers would be sufficient to enable an otherwise deficient *pro se* pleading to survive a Rule 12(b)(6) motion, a court may deem the pleading amended to include the additional allegations.  *See id*.

B.     **Title VII Standards**

1.     **Exhaustion Requirement and Statutory Limitations Periods**

"It is well established that Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court." *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) (citing *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)).  In order to maintain a suit under the statute, an aggrieved employee must first file an administrative charge, either with the EEOC within 180 days, or with a state or local agency[9] within 300 days, of the alleged unlawful employment practice.  42 U.S.C. § 2000e-5(e)(1).  If the administrative complaint is dismissed or otherwise fails to result in resolution, then the EEOC will notify the complainant of his or her right to bring a civil action under Title VII.  *Id.* § 2000e-5(f)(1).  Such an action must be brought within 90 days of the complainant's receipt of a right-to-sue notice from the EEOC.  *See id.*; *see also, e.g.*, *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir. 1996) (citing statute).

As a general matter, a federal court complaint must be limited to the scope of the plaintiff's prior administrative complaint.  *See Farren v. Shaw Envtl., Inc.*, 510 F. App'x 44, 46 (2d Cir. 2013).  Courts will not permit a claim to proceed where that claim is based on a "wholly different type of discrimination" than that asserted in the EEOC charge.  *See Peterson v. Ins. Co. of N. Am.*, 884 F. Supp. 107, 109 (S.D.N.Y. 1995).  Rather, the court may only hear Title VII

---

[9] By virtue of a work-sharing agreement between the EEOC and the NYC CHR, "a filing with the NYC CHR constitutes a 'dual-filing' with the EEOC." *Isaacson v. N.Y. Organ Donor Network*, No. 08cv9545 (RMB) (THK), 2009 WL 9119999, at *2 n.2 (S.D.N.Y. Dec. 30, 2009) (citation omitted).

claims that are either included in an EEOC charge or are "reasonably related" to the allegations included in that charge.  *See Farren*, 510 F. App'x at 46.

A plaintiff's claim may be found to be "reasonably related" to his or her administrative charge where the claim would "reasonably be expected to grow out of the charge" that was alleged, and where the challenged conduct thus could have been expected to "fall within the scope of the EEOC investigation."  *Id*. (quoting *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1391, 1402 (2d Cir. 1993)).  The allowance of a plaintiff's claim in such a circumstance is "'essentially an allowance of loose pleading,'" *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (quoting *Butts*, 990 F.2d at 1402), intended to "[r]ecogniz[e] that EEOC charges are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he or] she is suffering," *Minetos v. City Univ. of N.Y.*, 875 F. Supp. 1046, 1052 (S.D.N.Y. 1995) (citing *Butts*, 990 F.2d at 1402).  In determining whether a claim would have reasonably fallen within the scope of an EEOC investigation, "the focus [of courts] should be on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin*, 335 F.3d at 201 (internal quotation marks and citation omitted).  In other words, "it is the substance of the charge and not its [legal] label that controls."  *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998).

"The purpose of this exhaustion requirement is to give the administrative agency the opportunity to investigate, mediate, and take remedial action."  *Fowlkes*, 790 F.3d at 384 (internal quotation marks and citation omitted).  There is no exception to the exhaustion requirement for *pro se* plaintiffs; rather, "[t]he administrative exhaustion requirement applies to

*pro se* and counseled plaintiffs alike."   *Id.* (citing *Pikulin v. City Univ. of N.Y.*, 176 F.3d 598, 599-600 (2d Cir. 1999) (per curiam)).

Exhaustion, however, is not a jurisdictional requirement.  *Id.*  Rather, the failure to exhaust is an affirmative defense, and thus "a plaintiff is not required to plead or demonstrate administrative exhaustion at the pleading stage."  *Burton v. Am. Fed. of Gov't Emps. (AFGE) 1988*, No. 11cv1416 (SLT) (LB), 2012 WL 3580399, at *7 (E.D.N.Y. Aug. 17, 2012).  Even so, an affirmative defense of a failure to exhaust can be raised on a Rule 12(b)(6) motion, where non-exhaustion is clear from the face of the plaintiff's complaint, or from documents attached thereto or incorporated therein.  *See Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 594 n.5 (E.D.N.Y. 2013).  In the Title VII context, a court may also take judicial notice of "public records and reports of relevant administrative bodies, as well as the facts set forth therein," in order to determine whether a complaint should be dismissed for lack of exhaustion. *Holmes v. Fresh Direc*t, No. 13cv4657 (NGG) (CLP), 2015 WL 4885216, at *4 (E.D.N.Y. Aug. 5, 2015).

### 2.    Substantive Pleading Requirements

Title VII forbids employment discrimination on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  As an evidentiary matter, a plaintiff can make out a *prima facie* case of disparate treatment by showing that he or she:  (1) belongs to a protected class; (2) was qualified for his or her position; (3) suffered from an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015).  The Federal Rules, however, "do not contain a heightened pleading standard for employment discrimination suits," *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002), and thus, to meet

the pleading standards of Rule 8(a)(2) of the Federal Rules of Civil Procedure (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief"), a Title VII plaintiff need not plead a *prima facie* case of discrimination, *see Swierkiewicz*, 534 U.S. at 511, 515.  Rather, the plaintiff need only give the defendant "fair notice" of the plaintiff's claims, "and the grounds upon which they rest."  *Id.* at 514.

Nonetheless, as set out above, a plaintiff's allegations must also meet the "plausibility" requirement of *Twombly* and *Iqbal*, in order to withstand a motion to dismiss brought under Rule 12(b)6).  In other words, to survive a Rule 12(b)(6) challenge, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  Where a complaint claims employment discrimination under Title VII, this means that the pleading "must plausibly allege that (1) the employer took adverse action against [the plaintiff] and (2) his [or her] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega*, 801 F.3d at 86.  In this context, an "adverse employment action" is defined as "a materially adverse change in the terms and conditions of employment." *Schiano v. Quality Payroll Sys., Inc*., 445 F.3d 597, 609 (2d Cir. 2006) (internal quotations and citations omitted); *see also Galabya v. New York City Bd. of Educ*., 202 F.3d 636, 640 (2d Cir. 2000).  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Schiano*, 445 F.3d at 609 (internal quotations and citations omitted).

For a Title VII retaliation claim to survive a motion to dismiss, "the plaintiff must plausibly allege that:  (1) [the] defendant[] discriminated – or took an adverse employment

action – against him [or her], (2) 'because' he [or she] has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90 (quoting 42 U.S.C. § 2000e-3(a)).  In the context of a retaliation claim, an "adverse employment action" is more broadly defined than it is in the context of a discrimination claim.  *See id*.  The employer's conduct need not affect the terms and conditions of employment; rather, any action taken by an employer may be considered retaliatory, if it "'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  "As for causation, a plaintiff must plausibly plead a connection between the act and his [or her] engagement in protected activity."  *Id.* (citing 42 U.S.C. § 2000e-3(a)).  An allegation that protected activity was "followed closely in time" by the adverse employment action may suffice to satisfy this requirement.  *Id.* (citations omitted).

For a hostile-work-environment claim to survive a Rule 12(b)(6) challenge, the plaintiff must plausibly allege that the employer required him or her "to work in a discriminatorily hostile or abusive environment."  *Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015) (internal quotation marks and citation omitted).  Courts have explained that a hostile work environment is one that is both "objectively" severe and pervasive (such that a reasonable person would find it hostile or abusive), and "subjectively" perceived as such, by the plaintiff.  *See, e.g.*, *Bell v. McRoberts Protective Agency, Inc.*, No. 15cv963 (JPO), 2016 WL 7192083, at *4 (S.D.N.Y. Dec. 12, 2016).  Further, the hostile environment must have been created by the defendant "because" of the plaintiff's race, color, religion, sex, or national origin.  *Id*.

### C.   <u>Unfair Labor Practices</u>

As noted above, in his Second Amended Complaint, Plaintiff alleges that Defendants have engaged in "unfair labor practices" (2d Am. Compl. § II(A)), and, at one point in the

"FACTS" Section of his pleading, Plaintiff complains that the pay given to "in[-]house security" was lower than the pay given to workers who were brought in from an "outside security company" (Dkt. 14, at 8).  To the extent Plaintiff may be seeking to assert a claim under the FLSA, its basic provisions are summarized here.

Under the FLSA, an employee must be paid, at least, the federal statutory minimum wage for the first 40 hours that he or she worked in a given work week.  *See* 29 U.S.C. § 206(a).  An employee is also entitled to be paid for overtime hours (*i.e*., hours exceeding 40 per week), at a "rate not less than one and one-half times the regular rate at which [the employee] is employed." *Id*. § 207(a)(1).  A plaintiff with a successful minimum-wage or overtime claim under the FLSA is entitled to recover damages up to these statutory amounts, and may also be entitled to receive an additional equal amount in liquidated damages.  *See* 29 U.S.C. § 216(b); *see also* 29 U.S.C. § 260 (mandating that an employer pay liquidated damages unless the employer demonstrates that he was acting in "good faith" and "had reasonable grounds for believing" that he was not acting in violation of the FLSA).

## II.    DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIMS

### A.    Plaintiff's Title VII Claims

#### 1.    Failure To Exhaust Retaliation and Hostile-Work-Environment Claims

Defendants argue that Plaintiff has failed to exhaust any claims that were omitted from – and not reasonably related to – the claims he raised in his administrative complaint.  (*See* Def. Mem., at 8-9, 11-12.)  In this regard, Defendants argue that, as Plaintiff's administrative complaint was "limited solely to Plaintiff's allegations that Defendants discriminated against him because of his race 'by denying him equal terms and conditions of employment, and by terminating his employment'" (*id*., at 8 (quoting NYC CHR Comp. ¶ 9)), and contained *no*

allegations related to either of Plaintiff's current claims of retaliation or a hostile work environment (*id.*, at 8, 12), Plaintiff has failed to exhaust both his retaliation and hostile-work-environment claims.

Taking judicial notice of the contents of Plaintiff's administrative complaint, *see Holmes*, 2015 WL 4885216, at *4, this Court finds that Defendants are correct that Plaintiff's administrative charge alleged absolutely no facts capable of suggesting that Plaintiff had been subjected by Defendants to either retaliatory conduct or a hostile work environment.  At most, Plaintiff alleged therein that he is Black; that Hispanic workers with less seniority were given more work than he was; that he (and, upon information and belief, at least one other Black employee) were terminated; and that he was not given an explanation for his termination.  (*See* NYC HRC Compl. ¶¶ 1, 5-8.)  Nothing about these allegations suggests that Plaintiff had engaged in protected activity under Title VII and was either denied work or terminated in retaliation for engaging in such activity.  Nor is there anything in these allegations to suggest that Defendants had created an environment that a reasonable person would find hostile or abusive. Moreover, given the strict time-frames set out in Title VII, which – at most – allow only 300 days for a claim to be asserted administratively, following the events giving rise to the claim, *see* 42 U.S.C. § 2000e-5(e)(1), it would be too late for Plaintiff to attempt to return to the NYC HRC or the EEOC to try to assert any retaliation or hostile-work-environment claims now.  Plaintiff alleges that his employment was terminated on May 12, 2014, and, by the date Plaintiff commenced his action in this Court, 300 days from his termination had already passed.

For these reasons, Defendants' motion to dismiss Plaintiff's retaliation and hostile-work-environment claims should be granted.  Further, as Plaintiff has had the chance to respond to Defendants' argument that he failed to raise his retaliation and hostile-work-environment claims

in his administrative complaint and has offered no explanation at all for this failure, much less an explanation that could give rise to an equitable basis for excusing his failure to exhaust, the Court's dismissal of these claims should be with prejudice.

For these same reasons, any discrimination claim that Plaintiff may now be trying to assert in this action regarding any alleged failure by Defendants to promote him to an "upper management" position (Dkt. 14, at 8, 9), or to transfer him to another location (*id.*, at 9-10), should also be dismissed with prejudice for lack of exhaustion.  Plaintiff's administrative complaint contains not a hint that he sought either a promotion or a transfer and was denied such an opportunity.  As either a denial-of-promotion or a denial-of-transfer claim would represent a discrete claim, distinct from a claim for a denial of hours or of unlawful termination (as alleged in Plaintiff's administrative complaint), the omitted claims cannot be said to be "reasonably related" to the claims Plaintiff did raise.  *See Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004).

## 2. <u>Failure To State a Plausible Claim for Discriminatory Termination</u>

Defendants do not argue that Plaintiff failed to exhaust his Title VII claim that his employment was terminated for discriminatory reasons, apparently conceding that Plaintiff included such a claim in his administrative complaint.[10]  Rather, Defendants move to dismiss this

---

[10] This Court notes that, approximately three months after filing his administrative complaint, Plaintiff apparently requested that his complaint be dismissed by the NYC CHR, so that he could instead assert his claims in court.  (*See* Nuccio Decl., Exs. A, B.)  To the extent this could be viewed as a voluntary withdrawal of his administrative claims, Plaintiff may have abandoned his effort to exhaust any of his Title VII claims.  *See Stephens-Buie v. Shinseki*, No. 09cv2397 (LBS), 2011 WL 2574396, at *8 (S.D.N.Y. June 27, 2011) (holding that, "[w]hen a plaintiff voluntarily withdraws a timely filed claim during the EEOC process[] by withdrawing his claim[,] he effectively fail[s] to exhaust his remedies" (internal quotation marks and citations omitted)).  This Court also notes, however, that Defendants have not raised an abandonment argument in their motion, and thereby arguably waived it.  *See Fowlkes*, 790 F.3d at 384-85 (finding that, as exhaustion is not a jurisdictional requirement, it is subject to equitable defenses,

claim as inadequately pleaded.  Specifically, while acknowledging in a footnote in their moving brief that, "[t]o survive a motion to dismiss, plaintiffs alleging employment discrimination need not plead a *prima facie* case" (Def. Mem., at 5 n.4 (quoting *Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 404 (S.D.N.Y. 2014)), Defendants nonetheless argue that Plaintiff's discriminatory-termination claim cannot stand because he has failed to plead certain elements that would be necessary to make out a *prima facie* case of discrimination (*see generally* Def. Mem., at 5-8).

Setting aside the "*prima facie* case" construct, as it must, *see Swierkiewicz*, 534 U.S. at 515, this Court reads Defendants' core argument to be that Plaintiff's allegations do not plausibly suggest that his membership in a protected class (whether by virtue of his race, color, religion, sex, or national origin) was "a motivating factor" in Defendants' termination decision, *see Vega*, 801 F.3d at 86.  Given the conclusory nature of many of Plaintiff's factual allegations, and the sparsity of his allegations about his termination in particular, this argument is persuasive. *See EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (holding that, "while a discrimination complaint need not allege facts establishing each element of a *prima facie* case of discrimination to survive a motion to dismiss" (citing *Swierkiewicz*, 534 U.S. at 510), "it must at

---

such as waiver, estoppel, or equitable tolling); *cf. Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 203-04 (E.D.N.Y. 2014) (finding that where, on summary judgment, defendants did not raise an exhaustion argument, but rather addressed the merits of plaintiff's claims, defendants waived defense that the claims were unexhausted).  In any event, even if the argument has *not* been waived, *see Toliver v. Stefinik*, No. 9:12cv00077, 2016 WL 3349316, at *5 (N.D.N.Y. June 15, 2016) (finding that, where defendants included an exhaustion defense in their answer, they had not waived the defense by choosing not to raise it in their pre-answer motion to dismiss), I do not recommend that the Court resolve Plaintiff's claims on this basis, given that the argument was not briefed by Defendants, and Plaintiff has had no opportunity to address it in opposition.

a minimum assert nonconclusory factual matter sufficient to 'nudge[] [its] claims' . . . 'across the line from conceivable to plausible' to proceed" (quoting *Iqbal*, 556 U.S. at 680)).

Plaintiff does not even identify his race in his Second Amended Complaint or his opposition papers, although, taking judicial notice of his administrative complaint, this Court understands that he is Black.  (*See* NYC CHR Compl. ¶ 1.)  Yet, even with this understanding, this Court sees nothing in Plaintiff's submissions – even read liberally and as a whole – that could plausibly give rise to an inference that Defendants were motivated to terminate his employment because he is Black.  In his administrative complaint, Plaintiff merely asserted that he was given no explanation for his termination, and that, on information and belief, another Black employee was also terminated at around the same time (*see id.* ¶¶ 7-8) – allegations too tenuous to suggest discriminatory animus.  Now, in his current pleading and opposition papers, Plaintiff's only reference to race is that, on October 7, 2008, he wrote a letter to a general manager, complaining, at that time, that the Director of Security had been "verbally abusive" to African-American employees.  (Pl. Opp., at 1.)  Given that Plaintiff's employment was terminated on May 12, 2014, nearly *six years* after the date of the letter he claims to have written, the facts alleged by Plaintiff do not even suggest a *retaliatory* motive for his termination. *See, e.g.*, *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (noting that, for retaliation, "a causal connection . . . can be established indirectly by showing that the protected activity was closely followed in time by the adverse [employment] action." (internal quotation marks and citation omitted)).

Indeed, while Plaintiff seems to suggest that, over the course of many years, he was retaliated against in the workplace for being outspoken or for using company procedures to voice complaints (*see* Dkt. 14, at 9 (stating that Plaintiff and others were "blackmailed if [they] spoke

out to the HR Department"); Pl. Opp., at 1 (stating that, after airing "all [his] grievances" in January 2009, Plaintiff's "[r]emaining years at [MSG] were awful and [he] felt that [he] was being punished for following all the procedure[s] that [the] company had laid out for its employee to safely give complaints")), he makes no allegation whatsoever regarding the genesis or circumstances of the decision to terminate his employment.  In his current pleading, his only allegation that even mentions his termination is the vague and conclusory charge that a Human Resources Director (Higgins) "was plotting to terminate [him]."  (Dkt. 14, at 8.)  This is not enough to allege plausibly that Plaintiff's race, or any other protected characteristic, was a motivating factor in his termination.

Moreover, as Defendant aptly points out (Def. Mem., at 14-16), Plaintiff was twice ordered to amend his pleading so as to provide plausible allegations of discrimination, and was twice given instructions, in the Court's Orders, as to what he should plead to state a viable discrimination claim (*see* Dkts. 5, 13). While the Court should not dismiss the claim of a *pro se* plaintiff as deficient without first affording the plaintiff leave to amend, *see Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014), here, Plaintiff has been afforded such leave twice, and the Court is not required to grant him leave to amend a third time.  Even more importantly, this Court has carefully reviewed all of the allegations that Plaintiff has made, in his current pleading, in his opposition papers, in all of his prior submissions to the Court, and in his administrative complaint, and it seems apparent that Plaintiff is unable to plead facts that plausibly suggest that his termination was discriminatory.  Under these circumstances, I recommend that his Title VII termination claim be dismissed with prejudice.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (upholding dismissal of *pro se* pleading and rejecting plaintiff's argument that she should be given leave to replead, where even a liberal reading of the complaint gave no

indication that plaintiff either inadequately or inartfully pleaded an otherwise valid claim (citation omitted)).

### 3.   Potential Claim for Denial of Work That Was Allegedly Given, on a Preferential Basis, to Hispanics

Defendants do not address, in their motion, the question of whether Plaintiff's current pleading, liberally construed, may be found to include a claim that Plaintiff was denied hours of work (and thus pay) that were instead given to other workers because they were Hispanic.  In his administrative complaint, as quoted above, Plaintiff was explicit that, during a period of time prior to his termination, his work hours were allegedly drastically reduced (from the "usual schedule of 25-35 hours/week" to only "5-7 hours," if any at all), while Mendez "gave more work to Hispanic workers during this period who had less seniority than [Plaintiff]."  (*See* NYC CHR Compl. ¶ 6; *see also* Background, *supra*, at Section B.)  In both his Second Amended Complaint and opposition to Defendants' motion, Plaintiff similarly refers to "preferential treatment" that was allegedly given to Hispanic employees (*see* 2d Am. Compl. § II(E); Pl. Opp., at 1), and, in his opposition papers, he complains that his work hours were reduced (*see* Pl. Opp., at 1-2).  In his various submissions to this Court, however, Plaintiff never ties the two concepts together.  In other words, Plaintiff fails to plead, in this Court, that Defendants' alleged preferential treatment of Hispanics resulted in his being denied work hours that he would otherwise have received.

Accepting that the fair implication of Plaintiff's allegations is that he, himself, is not Hispanic, Plaintiff may be attempting to plead that he was discriminated against on the basis of his national origin.  Nonetheless, absent the type of allegations that he set forth in his administrative complaint, which suggested a causal connection between workers' national origin and the distribution of work hours, Plaintiff cannot be said to have pleaded, in this forum,

sufficient facts to support a non-conclusory, and hence plausible, claim of disparate treatment on this basis. For this reason, the Second Amended Complaint, even if deemed amended to include the allegations contained in Plaintiff's opposition papers, cannot be found sufficient to state a plausible discrimination claim based on denial of hours as an adverse employment action, motivated by Plaintiff's protected characteristic of being non-Hispanic.

In considering whether this Court should recommend that Plaintiff be given leave to file a third amended complaint, so as to render more specific any intended allegations that he was denied hours of work because of his national origin, this Court again notes that Plaintiff has already twice been granted leave to amend. In addition, this Court is cognizant of the fact that, in its second Order To Amend, the Court not only provided instruction as to what would be necessary to state a Title VII discrimination claim, but also explicitly stated: "If Plaintiff fails to comply with this order, the Court *will not grant him leave to amend his complaint again*." (Dkt. 13, at 6 (emphasis added).) Nonetheless, a number of factors may warrant revisiting that aspect of the Court's last Order To Amend and affording Plaintiff one final opportunity to plead a discriminatory denial-of-hours claim.

First, this Court notes that the prior instructions that were given to Plaintiff in the Orders To Amend were fairly general in nature, and did not specifically address this potential claim. Second, unlike any claim for retaliation, hostile-work-environment, failure-to-promote, or failure-to-transfer that Plaintiff may have been trying to assert in this forum, his potential denial-of-hours claim would not fail for lack of exhaustion, as such a claim was plainly raised in Plaintiff's administrative complaint. Third, unlike Plaintiff's discriminatory termination claim, which, as noted above, finds no plausible support in any of the factual allegations made by Plaintiff at any point during either his administrative proceedings or the proceedings before this

Court, the allegations contained in Plaintiff's administrative complaint suggest that a discriminatory denial-of-hours claim might be viable.  Certainly, this Court "cannot 'rule out any possibility'" that a third amended complaint would succeed in stating such a claim.  *Shomo v. City of New York*, 579 F.3d 176, 184 (2d Cir. 2009) (quoting *Cruz v. Gomez*, 202 F.3d 593, 597-98 (2d Cir. 2000)).  Finally, the fact that Defendants did not address such a claim in their motion and that, as a result, Plaintiff may not have focused on spelling out this claim in greater detail in his opposition papers (which, given his *pro se* status, could have then enabled this Court to deem his existing pleading amended (*see* Discussion, *supra*, at Section I(A))), militates against dismissing the claim *sua sponte*, without leave to amend.

For all of these reasons, I recommend that Plaintiff be granted one *final* opportunity to file a further amended pleading, solely for the purpose of asserting a discriminatory denial-of-hours claim, should he wish to do so.  I further recommend that, if leave to amend is granted, then Plaintiff be instructed to allege, in his third amended complaint, that he is not Hispanic (assuming that this is true); that he suffered an adverse employment action – in particular, that he was denied hours of work; and that a motivating factor for Defendants' denying him hours of work was his non-Hispanic national origin.  Plaintiff should also be instructed to clarify, in a third amended complaint, the period of time in which he was denied work hours that were instead given to Hispanic workers; the fact that, in terms of his job position and qualifications, he was similarly situated to the workers who were awarded the hours that he was denied; and the damages he suffered as a result of any discriminatory denial of hours.

### B.   <u>Fair Labor Standards Act Claim</u>

This Court need not dwell, at length, on the question of whether Plaintiff – who has accused Defendants of "unfair labor practices" (*see* 2d Am. Compl. § II(A)) – has adequately

stated an FLSA claim.  He plainly has not.  While his submissions complain that employees in

Defendants' security department were treated, by senior management, as "slave labor" (Dkt. 14,

at 8); were paid less than workers from an outside company who were brought in to work at

special events (*id*.); and were not appropriately paid for "fireguard" duty (*id*., at 9); nowhere does

Plaintiff ever allege that he was paid below the federal minimum wage or was denied overtime

pay for any hours that he worked in excess of 40 per week.  To the contrary, to the extent

Plaintiff references the amount of his pay at all, he appears to suggest that he was paid at the

hourly rate of $12 to $13 per hour (*id.*, at 8), which, for the period of his employment, would

have been above the minimum wage required by the FLSA.

Under these circumstances, and given that the Court has already instructed Plaintiff as to

what he would need to allege to support an FLSA claim (*see* Dkt. 13), I recommend that the

Court dismiss, with prejudice, any FLSA claim that Plaintiff may be attempting to allege in his

Second Amended Complaint.

## <u>CONCLUSION</u>

For the foregoing reasons, I recommend that Defendants' motion to dismiss Plaintiff's

Complaint (Dkt. 26) be resolved as follows:

1. That Plaintiff's Title VII claims for retaliation and hostile work environment, as well as any claims that Plaintiff may be attempting to assert for failure to promote or to transfer, be dismissed, with prejudice, as unexhausted;

2. That Plaintiff's Title VII claim for discriminatory termination of his employment be dismissed, with prejudice, for failure to plead factual allegations that could plausibly support such a claim, despite two prior Orders To Amend;

3. That, to the extent Plaintiff may be seeking to assert a Title VII claim that he was denied hours of work because he is not Hispanic (a claim not addressed in Defendants' motion), he be granted one final opportunity to file a third

amended complaint setting out the basis of such a claim, and that he be given specific pleading instructions in that regard, as set out above; and

4.      That any FLSA claim that Plaintiff may be attempting to assert be dismissed, with prejudice, for failure to state a claim.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall

be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the

HonorableGeorge B. Daniels, U.S.D.J., United States Courthouse, 500 Pearl Street, Room 1310,

New York, New York 10007, and to the chambers of the undersigned, United States Courthouse,

500 Pearl Street, Room 1660, New York, New York, 10007.  Any requests for an extension of

time for filing objections must be directed to Judge Daniels.  <u>As Plaintiff is proceeding in this</u>

<u>action *pro se*, any submissions he makes to the Court (including any objections to this Report</u>

<u>and Recommendation for filing, any courtesy copies for judges' chambers, and any requests for</u>

<u>extensions of time) should be mailed or otherwise delivered by him to the Court's *Pro Se* Office.</u>

FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A

WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *See Thomas v.*

*Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054

(2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd*.,

838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

If Plaintiff does not have access to cases cited herein that are reported on Westlaw or

LexisNexis, he may request copies from Defendants' counsel.  *See* Local Civ. R. 7.2 ("Upon

request, counsel shall provide the pro se litigant with copies of such unpublished cases and other

authorities as are cited in a decision of the Court and were not previously cited by any party.").

Dated: New York, New York
     January 25, 2017

                                   Respectfully submitted,

                                   DEBRA FREEMAN
                                   United States Magistrate Judge

Copies To:

The Honorable George B. Daniels, U.S.D.J.

Mr. Sean Felder
2579 D 8th Ave.
New York, NY 10030

Defendants' counsel (via ECF)